UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ALEJANDRO ESPINOZA,                       CASE NO.

         Plaintiff,

vs.

LEGO BRAND RETAIL, INC., a Foreign Profit
Corporation D/B/A LEGO

         Defendant.

_____/

## COMPLAINT FOR DECLARATORY AND
## INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND

Plaintiff, ALEJANDRO ESPINOZA, through undersigned counsel, sues Defendant, LEGO BRAND RETAIL, INC., a foreign profit corporation d/b/a LEGO (hereinafter referred to as "LEGO"), for declaratory and injunctive relief, and damages, and alleges as follows:

This action is brought under Title III of the Americans with Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

1)      This action is also brought pursuant to 28 C.F.R. Part 36.

2)      This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

3)      Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

4)      Plaintiff is sui juris, and he is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

5)      Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6)     Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase a McLaren MP4/4 & Ayrton Senna.

7)     Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer.  The computer is Plaintiff's personal property, and a claim for trespass attached to same.

8)     The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

9)     The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

10)     Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

11)     Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

12)     At all relevant times, Plaintiff is and was visually impaired and has Leber Congenital Amaurosis since birth that substantially impairs Plaintiff's vision whereby his vision fluctuates from 20/250 to 20/800.

13)     Plaintiff's visual impairment interferes with his day-to-day activities and causes limitations in visualizing his environment.  As such, Plaintiff is a member of a protected class under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

14)     In addition, Plaintiff is an advocate of the rights of similarly situated disabled persons. As such is a "tester" for the purposes of asserting his civil rights and monitoring, ensuring, and determining whether places of public accommodation and/or their respective and associated

websites are in compliance with the ADA and any other applicable disability laws, regulations, and ordinances.

15)     Plaintiff is limited in the performance of major life activities due to his visual disability and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

16)     Plaintiff uses the computer regularly, but due to his visual disability, Plaintiff cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. In order to assist him, Plaintiff uses NVDA screen reader software that is readily available commercially. As background, screen reader software translates the visual internet into an auditory equivalent.  The software reads the content of a webpage to the user at a rapid pace.

17)     "The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard." *Andrews v. Blick Art Materials, LLC, 17-CV-767, 2017 WL 6542466, at \*6-7 (E.D.N.Y. Dec. 21, 2017)*.

18)     Plaintiff frequently accesses the internet. Because he is significantly and permanently visually disabled, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, Plaintiff uses commercially available screen reader software to interface with the various websites.

19)     Defendant, LEGO, is a foreign profit corporation authorized to do business and doing business in the State of Florida.

20)     Defendant, LEGO, is a company that sells Lego sets, Lego bricks, merchandise, gift cards, home décor, and accessories. There is a retail location in Miami-Dade County.

21)     At all times material hereto, Defendant was and still is a private entity which owns and operates retail locations under the brand name "LEGO". The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

22)     Because Defendant is a store open to the public, each of Defendant's physical stores is a place of public accommodation subject to the requirements of the ADA, 42 U.S.C. §12182, §12181(7)(B), and its implementing regulations, 28 C.F.R. Part 36.

23)     At all times material hereto, Defendant was and still is an organization owning and operating the website located at https://www.lego.com/. Since the website is open through the internet to the public as an extension of the retail stores, by this nexus the website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, the Defendant has subjected itself and the associated website it created and maintains to the requirements of the ADA. The website also services Defendant's physical stores by providing information on its brand and

4

other information that Defendant is interested in communicating to its customers about its physical locations.

24)     Since the website allows the public the ability to view the products available at Defendant's locations, purchase products, through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand, the website is an extension of, and gateway to, Defendant's physical stores which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). By this nexus between Defendant's retail store locations and the Website, and the fact that the Website clearly provides support for and is connected to Defendant's stores for its operation and use, the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar stores that must comply with all requirements of the ADA.  The Website must not discriminate against individuals with disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as afforded the non-visually disabled public both online and in the physical stores, which are places of public accommodations subject to the requirements of the ADA.

25)     Plaintiff sought to, seeks to and intends to patronize, in the near future once the Website's access barriers are removed or remedied, one or more of Defendant's physical retail locations, check store hours and product pricing and place online orders. In the alternative, Plaintiff intends to monitor the Website in the near future as a tester to ascertain whether it has been remedied and updated to interact properly with screen reader software.

26)     Traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience, thus the opportunity to shop and pre-shop Defendant's products, plan his visits, and to compare products, services, prices, sales,

discounts, and promotions are important and necessary accommodations for Plaintiff because Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

27)      During the month of August 2024, Plaintiff attempted on a number of occasions to utilize the Website to browse through the merchandise and online offers to educate himself as to the merchandise, sales, discounts, and promotions being offered, learn about the brick-and-mortar location, check store hours, and check product pricing with the intent to make a purchase through the Website or in one of the physical locations and with the intent to make a purchase through the website or at one of Defendant's physical stores.  Plaintiff also attempted to access and utilize the Website in his capacity as a tester to determine whether it was accessible to blind and visually disabled persons such as himself who use screen reader software to access and navigate company websites.

28)      Plaintiff utilized NVDA ("Screen Reader Software") that allows individuals who are blind and visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. Plaintiff attempted to purchase clothing on Defendant's website.  However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

29)      Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. These barriers are pervasive and include, but are not limited to:

Lego   **https://www.lego.com/**

System settings while doing the review:

Operating system: Windows 11

Browser: Google Chrome v. 125.0.6422.142

Screen Reader: NVDA v. 2024.2

**Barriers**

User cannot operate the filters modal.

User cannot navigate the site in a meaningful way.

User is not provided bypass mechanisms.

User cannot operate the Sign In form.

User cannot operate the Register form.

User cannot operate the site.


**Violation 1: 3.3.1 Error Identification**

If an input error is automatically detected, the item that is in error is identified and the error is described to the user in text.

When the user navigates the home page, the skip to main content link cannot be reached or operated using a keyboard.

Applicable WCAG 2.1 Standard at Issue: 3.3.1 Error Identification (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EUCtbM76QERPtJri71qb6W0BTo7fI82dta7Z Z0DeOJMYVg

**Violation 2: 2.4.1 Bypass Blocks**

A mechanism is available to bypass blocks of content that are repeated on multiple Web pages

When the user navigates the home page, there are no bypass mechanisms to skip content like the carousel at the top of the page, the navigation menus, etc.

Applicable WCAG 2.1 Standard at Issue: 2.4.1 Bypass Blocks (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EadG4KK1q0ZElGVZ2w6GosABTnjj5-oChndN4B577a3y-w

**Violation 3: 2.4.3 Focus Order**

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

When the user navigates to the accessibility page, the Lego.com Needs Your Help Modal is displayed and stays visible covering content on the page. However, the user is allowed to navigate the page; focus is given to content not visible. The focus order cannot be navigated in sequential order to preserve operability.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/page/accessibility

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EYcizNOWA65FoL9xPEFoW0EBWhrFJrUup
2PE2QL2WpSaEw

**Violation 4: 1.3.2 Meaningful Sequence**

When the sequence in which content is presented affects its meaning, a correct reading

sequence can be programmatically determined.

When the user navigates to the accessibility page, the Lego.com Needs Your Help Modal

is displayed and stays visible covering content on the page. The user cannot close the

modal and is allowed to navigate the page. The meaningful sequence is not preserved.

Applicable WCAG 2.1 Standard at Issue: 1.3.2 Meaningful Sequence (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/page/accessibility

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EWoNnACbXVdJnOk8267sRCQBpwDs-
aZYovBqrxzOjQ5Mrw

**Violation 5: 1.4.3 Contrast (Minimum)**

The visual presentation of text and images of text has a contrast ratio of at least 4.5:1,

except for the following: Large Text: Large-scale text and images of large-scale text have

a contrast ratio of at least 3:1; Incidental: Text or images of text that are part of an

inactive user interface component, that are pure decoration, that are not visible to anyone,

or that are part of a picture that contains significant other visual content, have no contrast requirement.

When the user navigates to the accessibility page, the Lego.com Needs Your Help Modal is displayed and stays visible covering content on the page. The contrasts between texts and backgrounds are below the minimum contrast ratio.

Applicable WCAG 2.1 Standard at Issue: 1.4.3 Contrast (Minimum) (Level AA)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/page/accessibility

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EcTQqPy0niZDqGXGNTd_sswB-D3JZuFksVZDIpeOdsZ1bA


**Violation 6: 1.4.3 Contrast (Minimum)**

The visual presentation of text and images of text has a contrast ratio of at least 4.5:1, except for the following: Large Text: Large-scale text and images of large-scale text have a contrast ratio of at least 3:1; Incidental: Text or images of text that are part of an inactive user interface component, that are pure decoration, that are not visible to anyone, or that are part of a picture that contains significant other visual content, have no contrast requirement.

The contrast of text and background in many sections iof the home page s below the minimum contrast ratio.

Applicable WCAG 2.1 Standard at Issue: 1.4.3 Contrast (Minimum) (Level AA)

URL Where Issue Was Encountered:

https://www.lego.com/en-us

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ES__Yp7uwZBHkkveiZHOgrkBAmRig7BBh

6AcfSlkG5yjdw

**Violation 7: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring

specific timings for individual keystrokes, except where the underlying function requires

input that depends on the path of the user's movement and not just the endpoints.

The user cannot reach to all products in the carrousels Feature Sets and What Others Are

Buying. The user cannot operate the carrousels using a keyboard.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ETuyD5P-

hoNBkPiT9ROhsAcBvz6_M2UXYMYiDUZaVz2Hwg

**Violation 8: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring

specific timings for individual keystrokes, except where the underlying function requires

input that depends on the path of the user's movement and not just the endpoints.

The user cannot reach to all the products in the Bring Home The Race Carousel. The user cannot operate the carrousel using a keyboard.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EVCJepQJGGBIrAMSvtmcclEB0FjfEBb8476 STG1jEupHWw


**Violation 9: 1.1.1 Non-text Content**

All non-text content that is presented to the user has a text alternative that serves the equivalent purpose, except for the situations listed below. Controls, Input If non-text content is a control or accepts user input, then it has a name that describes its purpose. (Refer to Success Criterion 4.1.2 for additional requirements for controls and content that accepts user input.) Time-Based Media If non-text content is time-based media, then text alternatives at least provide descriptive identification of the non-text content. (Refer to Guideline 1.2 for additional requirements for media.) Test If non-text content is a test or exercise that would be invalid if presented in text, then text alternatives at least provide descriptive identification of the non-text content. Sensory If non-text content is primarily intended to create a specific sensory experience, then text alternatives at least provide descriptive identification of the non-text content. CAPTCHA If the purpose of non-text content is to confirm that content is being accessed by a person rather than a computer, then text alternatives that identify and describe the purpose of the non-text content are

provided, and alternative forms of CAPTCHA using output modes for different types of sensory perception are provided to accommodate different disabilities. Decoration, Formatting, Invisible If non-text content is pure decoration, is used only for visual formatting, or is not presented to users, then it is implemented in a way that it can be ignored by assistive technology.

When the user navigates to a product's page, the images of the product have no description of their contents. Instead, the screen reader describe them as Thumbnail Button.

Applicable WCAG 2.1 Standard at Issue: 1.1.1 Non-text Content (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/product/lamborghini-countach-5000-quattrovalvole-10337?icmp=HP-SHH-Standard-IC_Hero_Project_Scissor_10337_Still_Life_HP-EX-IC-NTWM10GF7Y

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EdT11OmwbX1OpY-pJvEv8b8BziW8WCLkIkq2hMbgccvjlQ


**Violation 10: 1.2.3 Audio Description or Media Alternative**

An alternative for time-based media or audio description of the prerecorded video content is provided for synchronized media, except when the media is a media alternative for text and is clearly labeled as such.

There is no audio description or media alternative of the video.

Applicable WCAG 2.1 Standard at Issue: 1.2.3 Audio Description or Media Alternative (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/product/lamborghini-countach-5000-quattrovalvole-10337?icmp=HP-SHH-Standard-IC_Hero_Project_Scissor_10337_Still_Life_HP-EX-IC-NTWM10GF7Y

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/Eb9567foH7tNgu68jaCH6MgBcgRATIRl21V HUXChB_bKKw

**Violation 11: 2.4.1 Bypass Blocks**

A mechanism is available to bypass blocks of content that are repeated on multiple Web pages

When the user navigates to a product's page, there are no bypass mechanisms offered to skip content like the carousel at the top of the page, the navigation menus, etc.

Applicable WCAG 2.1 Standard at Issue: 2.4.1 Bypass Blocks (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/product/lamborghini-countach-5000-quattrovalvole-10337?icmp=HP-SHH-Standard-IC_Hero_Project_Scissor_10337_Still_Life_HP-EX-IC-NTWM10GF7Y

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EZOMUzpKKDVGmln3u6MPEBUBjELnmX kMw8wlOhum8OpONA

**Violation 12: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints.

Using a keyboard the user cannot operate the Features accordion.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/product/lamborghini-countach-5000-quattrovalvole-10337?icmp=HP-SHH-Standard-IC_Hero_Project_Scissor_10337_Still_Life_HP-EX-IC-NTWM10GF7Y

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ESVtqfQ33qhCsfzJxW7q8NQBo5Lzyv74fblC LKZwnWWarA


**Violation 13: 2.4.1 Bypass Blocks**

A mechanism is available to bypass blocks of content that are repeated on multiple Web pages

When the user navigates through a product's page, there are no bypass mechanisms offered to skip content in the footer.

Applicable WCAG 2.1 Standard at Issue: 2.4.1 Bypass Blocks (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/product/lamborghini-countach-5000-quattrovalvole-10337?icmp=HP-SHH-Standard-IC_Hero_Project_Scissor_10337_Still_Life_HP-EX-IC-NTWM10GF7Y

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EaSpnMrf0VhAtjz0WuU7w0UBvTsop5DUW ORQzrym_rExbA

**Violation 14: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints.

The user cannot operate all the filter check boxes in the Product Type filter. After pressing the See More button, the remaining filters in the section are skipped.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-us/search?q=star+wars&inStockOnly=1&filters.i0.key=variants.attributes.availabilityStat us.zxx-US&filters.i0.values.i0=%2A_PRE_ORDER_FOR_DATE%22%2C%22C_PRE_ORD ER%22%2C%22E_AVAILABLE%22%2C%22F_BACKORDER_FOR_DATE%22%2 C%22G_BACKORDER%

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EcqozvDyz2tPmsAjVSOisX4Br0OVoK-

yaG7CEu6KvsVLmg

### Violation 15: 3.3.2 Labels or Instructions

Labels or instructions are provided when content requires user input.

The next button is incorrectly labeled. After pressing the button, the user is taken to the

product's page.

Applicable WCAG 2.1 Standard at Issue: 3.3.2 Labels or Instructions (Level A)

URL Where Issue Was Encountered:

https://www.lego.com/en-

us/search?q=star+wars&inStockOnly=1&filters.i0.key=variants.attributes.availabilityStat

us.zxx-

US&filters.i0.values.i0=%22A_PRE_ORDER_FOR_DATE%22%2C%22C_PRE_ORD

ER%22%2C%22E_AVAILABLE%22%2C%22F_BACKORDER_FOR_DATE%22%2

C%22G_BACKORDER%

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EeZlq5cxXX1PsYZxDvQWXzkBkqLr0L-

kPU0Nh3bH9XbgPQ

### Violation 16: 3.3.1 Error Identification

If an input error is automatically detected, the item that is in error is identified and the

error is described to the user in text.

When the user operates the sign in form and enters an invalid email address in the username field (space in the string), there is no message to inform the user of such error.

Applicable WCAG 2.1 Standard at Issue: 3.3.1 Error Identification (Level A)

URL Where Issue Was Encountered:

https://identity.lego.com/en-US/login?returnUrl=%2Fconnect%2Fauthorize%2Fcallback%3FappContext%3Dfalse%26adultexperience%3Dtrue%26hideheader%3Dtrue%26scope%3Dopenid%2520email%2520profile%2520dob%26response_type%3Did_token%2520token%26client_id%3D316ad352-

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ERMjpy9VjIlGuQMVN0RYEQIBx8_DeuuPWCfPauaLvrBdNw

**Violation 17: 3.3.1 Error Identification**

If an input error is automatically detected, the item that is in error is identified and the error is described to the user in text.

When the user operates the sign in form and enters an invalid email address in the username field, there is no message to inform the user of such error (space character present in the string).

Applicable WCAG 2.1 Standard at Issue: 3.3.1 Error Identification (Level A)

URL Where Issue Was Encountered:

https://identity.lego.com/en-US/register?returnUrl=%2Fconnect%2Fauthorize%2Fcallback%3FappContext%3Dfalse

18

%26adultexperience%3Dtrue%26hideheader%3Dtrue%26scope%3Dopenid%2520email

%2520profile%2520dob%26response_type%3Did_token%2520token%26client_id%3D3

16ad3

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/Ee0vpmmjoaVFmsWWyufNh80BvwJG9jUve

EazJUNfG3k3qA

30)     Although the Website appeared to have an "accessibility" statement displayed and an

"accessibility" widget/plugin added, the "accessibility" statement and widget/plugin, when tested,

still could not be effectively accessed by, and continued to be a barrier to, blind and visually

disabled persons, including Plaintiff as a completely blind person. Plaintiff, although he attempted

to access the statement, thus, was unable to receive any meaningful or prompt assistance through

the "accessibility" statement and the widget/plugin to enable him to quickly, fully, and effectively

navigate the Website.

31)     The fact that Plaintiff could not communicate with or within the Website left him feeling

excluded, as he is unable to participate in the same shopping experience, with the same access to

the merchandise, sales, discounts, and promotions, as provided at the Website and in the physical

locations as the non-visually disabled public.

32)     Plaintiff desires and intends, in the near future once the Website's access barriers are

removed or remedied, to patronize one or more of Defendant's physical stores and to use the

Website, but he is presently unable to do so as he is unable to effectively communicate with

Defendant, due to his severe visual disability and the Website's access barriers. Alternatively, as

a tester using screen reader software, Plaintiff is unable to effectively access, navigate, and

communicate with Defendant through the Website due to his severe visual disability and the

Website's access barriers. Thus, Plaintiff, as well as others who are blind and with visual disabilities, will suffer continuous and ongoing harm from Defendant's intentional acts, omissions, policies, and practices as set forth herein unless properly enjoined by this Court.

33)     On information and belief, Defendant has not initiated a Web Accessibility Policy to ensure full and equal use of the Website by individuals with disabilities.

34)     On information and belief, Defendant has not instituted a Web Accessibility Committee to ensure full and equal use of Website by individuals with disabilities.

35)     On information and belief, Defendant has not designated an employee as a Web Accessibility Coordinator to ensure full and equal use of the Website by individuals with disabilities.

36)     On information and belief, Defendant has not instituted a Web Accessibility User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

37)     On information and belief, Defendant has not instituted a User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

38)     On information and belief, Defendant has not instituted a Bug Fix Priority Policy.

39)     On information and belief, Defendant has not instituted an Automated Web Accessibility Testing program.

40)     Defendant has not created and instituted an effective Specialized Customer Assistance line or service or email contact mode for customer assistance for the visually disabled.

41)     Defendant has not created and instituted on the Website a useful or accessible page for individuals with disabilities, nor displayed a link and information hotline, nor created an

information portal explaining when and how Defendant will have the Website, applications, and digital assets accessible to the visually disabled or blind community.

42)     The Website does not meet the Web Content Accessibility Guidelines ("WCAG") 2.0 Level AA or higher versions of web accessibility.

43)     Defendant has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals who want the safety and privacy of purchasing Defendant's products offered on the Website and in the physical stores from their homes.

44)     Defendant thus has not provided full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations provided by and through the Website and their physical stores in contravention of the ADA.

45)     Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

46)     The broad mandate of the ADA is to provide an equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet shopping websites such as the Website at issue in the instant action.

47)     Defendant is, and at all relevant times has been, aware of the barriers to effective communication within the Website which prevent individuals with visual disabilities from the means to comprehend information presented therein.

48)     Defendant is, and at all relevant times has been, aware of the need to provide full access to all visitors to the Website.

49)     The barriers that exist on the Website result in discriminatory and unequal treatment of individuals with visual disabilities, including Plaintiff.

50)     Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged hereinabove, and this suit for declaratory judgment and injunctive relief is his only means to secure adequate and complete redress from Defendant's unlawful and discriminatory practices in connection with its website access and operation.

51)     Notice to Defendant is not required because of Defendant's failure to cure the violations.

52)     Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

53)     Plaintiff has retained the undersigned attorneys to represent him in this case and has agreed to pay them a reasonable fee for their services.


**COUNT I – VIOLATION OF THE ADA**

54)     Plaintiff realleges paragraphs 1 through 53 as if set forth fully herein.

55)     Pursuant to 42 U.S.C. §12181(7)(B), Defendant is a public accommodation under the ADA and thus is subject to the ADA.

56)     Pursuant to 42 U.S.C. §12181(7)(B), the Website is covered under the ADA because it provides the general public with the ability to view the products available at Defendant's locations, purchase products through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand. The Website thus is an extension of, gateway to, and intangible service, privilege, and advantage of Defendant's physical locations. Further, the Website also serves to augment Defendant's physical stores by providing the public information about the stores and by educating

the public as to Defendant's brand and available products merchandise sold through the Website and in the physical stores.

57)     Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

58)     Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

59)     In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

60)     The Website must comply with the ADA, but it does not as specifically alleged hereinabove and below.

61)     Because of the inaccessibility of the Website, individuals with visual disabilities are denied full and equal access to and enjoyment of the goods, information, and services that Defendant has

made available to the public on the Website and in their physical stores in violation of 42 U.S.C. §12101, et seq, and as prohibited by 42 U.S.C. §12182, et seq.

62)     The Website was subsequently visited by Plaintiff's expert in August and the expert determination was that the same access barriers that Plaintiff had initially encountered, as well as numerous additional access barriers, existed. Defendant thus has made insufficient material changes or improvements to the Website to enable its full use and enjoyment by, and accessibility to, blind and visually disabled persons such as Plaintiff. Also, when the Website was visited by the expert, although the Website appeared to have an "accessibility" statement and widget/plugin linked on and displayed from its home page, the "accessibility" statement and widget/plugin, when tested, still could not be effectively used or accessed by, and continued to be a barrier to, blind and visually disabled persons such as Plaintiff. Defendant furthermore has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals, nor has it posted on the Website an effective and useful "accessibility" notice, statement, or policy to provide blind and visually disabled person such as Plaintiff with a viable alternative means to access and navigate the Website. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302. The lack of a viable and effective "accessibility" notice, policy, or statement and the numerous access barriers as set forth in the Declaration of Plaintiff's expert, Mario Saavedra, attached hereto and the contents of which are incorporated herein by reference, continue to render the Website not fully accessible to users who are blind and visually disabled, including Plaintiff.

63)     More violations may be present on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

64)     There are readily available, well-established guidelines on the internet for making Websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Examples of such guidelines include, but are not limited to, adding alt-text to graphics and ensuring that all functions can be performed using a keyboard. Incorporating such basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to Defendant.

65)     Defendant has violated the ADA -- and continue to violate the ADA -- by denying access to the Website by individuals such as Plaintiff with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Website are ongoing.

66)     The ADA requires that public accommodations and places of public accommodation ensure that communication is effective.

67)     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems".   Indeed, 28 C.F.R.§36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

68)     According to 28 C.F.R. §36.303(c), public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "In order to be effective, auxiliary aids and services must be provided in

accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

69)    Part 36 of Title 28 of the C.F.R. was designed and is implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

70)    As alleged hereinabove, the Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication, and thus violates the ADA.

71)    As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to their brick-and-mortar stores, Plaintiff has suffered an injury in fact by being denied full access to, enjoyment of, and communication with Defendant's Website and its physical stores.

72)    Because of the inadequate development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

73)    Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief, including an order to:

   i.    Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of the Website to a functional statement as to the Defendant's policy to ensure persons with disabilities have full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations through the Website and the physical locations.

ii.     Require Defendant to take the necessary steps to make the Website readily accessible to and usable by blind and visually disabled users, and during that time period prior to the Website's being made readily accessible, provide an effective alternative method for individuals with visual disabilities to access the information available on the Website until such time that the requisite modifications are made, and

iii.    Require Defendant to provide the appropriate auxiliary aids such that individuals with visual disabilities will be able to effectively communicate with the Website for purposes of viewing and locating Defendant's stores and becoming informed of and purchasing Defendant's products, and during that time period prior to the Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through the Website and the physical stores.

iv.     Plaintiff is entitled to recover his reasonable attorney's fees, costs, and expenses pursuant to the ADA. To that end, Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action and has agreed to pay them a reasonable fee for their services.

74)    WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendant for the following relief:

a.      A declaration that Defendant's website is in violation of the ADA;

b.      An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the website and

27

effectively communicate with the website to the full extent required by Title III of the ADA;

c.       An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1]would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations.  Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

d.       An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

e.       An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

f.       An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

g.       An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

---

[1] 

h.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

i.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

j.      An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems.

k.      An award to Plaintiff of his reasonable attorney's fees and costs pursuant to in 42 U.S.C. §§12181-12189, and pursuant to such other laws and statutes that may apply, and further relief as the Court deems just and equitable.

**COUNT II – TRESPASS**

Plaintiff realleges paragraphs 1 through 53 as if set forth herein.

75)     Defendant's website contains software analytics. Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

76)     Plaintiff never consented to and was unaware that Defendant's website was placing software on his computer.

77)     The "pop-up" or banner notice that appears on Defendant's website does not properly audibilize the cookies policy in a way where a visually disabled person like the Plaintiff can properly understand or give informed consent to allow tracking cookies to be placed on his computer.

78)     Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on his personal computer, which was done without his knowledge and consent.

79)     Defendant's trespass has damaged Plaintiff by affecting the condition and value of his computer.

80)     On its website, Defendant has an internet privacy policy section that can only be accessed by clicking a barely visible section at the bottom of the page called "Cookies Policy", providing that they use cookies and similar technologies to collect a consumer's information and they obtain non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

LEGO® Cookie Policy

*Last Modified: July 27th 2021*

We use cookies on our LEGO.com websites and our digital applications.

Cookies are small data files that your browser sets on your computer or device. A cookie itself does not contain or collect information. However, when it is read by a server via a web browser, it can help a website deliver a more user-friendly service – for example, remembering previous purchases or account details.

Both we and our third-party tracking partners use browser storage, app storage, cookies, pixels, beacons, scripts and tags to operate our websites and apps, and provided you have given consent, to analyze your use and market to you. We may receive reports on these from our third-party tracking partners on an individual and aggregate basis, and those partners may combine that information with other information they have collected from you.

The cookies we use fall into four categories.

Necessary Cookies: Necessary cookies are required to enable technical site functionality and to provide the services explicitly requested by you. This includes as an example services such as your selected country and language, keeping you logged in, providing security and fraud prevention, having your digital shopping bag and wish list items stored while you browse, remembering volume settings, and you getting access to secure areas of the website.  This category of cookies cannot be disabled and does not require a consent.

Analytic Cookies: These cookies are optional and collect information about how visitors use and experience our website in order to optimize design, operations, efficiency and to improve your user experience. We only ask for consent to place these types of cookies on sites that are intended for young people who are 16 years or older or adults.

LEGO® Marketing Cookies: These cookies are optional and used to learn more about your interest, including which sites and adds you click on, which products and services you are interested in, or purchase, on this and other of our websites or apps. We use this data to show you more personal marketing and product recommendations on our websites or in our apps, in our membership and program offerings and to use the information about your interests and behavior on our website to make the content of any marketing messages we send the user more relevant based on your interest and site behavior. We only ask for consent to place these types of cookies on sites that are intended for young people who are 16 years or older or adults.

Third-Party Marketing Cookies: These cookies are optional and allow third parties to collect cookies allowing us to make targeted marketing/ads of our products and services on other websites, apps and on social media.  If you allow this you will allow the listed third parties to set cookies tracking your interests and behavior including which products and services you are interested in, or purchase, on this and other websites, social media, apps and devices. Be aware that these third parties are either joint or independent data controllers of the personal data tracked via the cookies and they will use the data for their own purposes. These are the third parties we allow to place cookies on our websites and in our apps.

We only ask for permission to allow the above third parties to place these types of cookies on sites that are intended for young people who are 16 year or older or adults.

List of our cookies

See our Cookie Declaration listing our different types of cookies – including the third parties we share your cookie information with – either to process the cookie on our behalf or as separate data controllers.

Please be aware that some cookies are set by third-party media and advertising partners for our joint or their independent use and they may combine data collected from your visit to LEGO.com with information they have collected from you elsewhere. Please read their privacy policies on how your information is processed and what rights you have.

What about your privacy?

Some of the cookies set on LEGO.com will result in processing of your personal information.

In regard to "strictly necessary" cookies processing personal information, LEGO System A/S bases this processing on either:

our legitimate interest in preventing fraudulent behavior when using our website and its services;

our legitimate interest in allowing you to interact with our customer service via chat functionality and to remain logged in with your LEGO® VIP or LEGO Account;

our obligation to secure a safe use and operation of the website and the services offered on the website (including measures to secure compliance with our legal obligations towards children);

our contractual obligation to deliver specific services or functionalities specifically requested by the website user.

In regard to "analytical" and/ or "marketing" cookies processing personal information, LEGO System A/S bases its processing on consent, unless otherwise specifically appears from our privacy policy.

For cookies where a third party is joint controller or independent controller, please refer to the third party's privacy information linked to below, for more information on the legal basis of their processing of personal information as controllers.

What if I do not want cookies:

Necessary cookies are essential for the website and you cannot opt out of them, but you can delete necessary cookies after use – see how below.

For all other cookies, you can always adjust your settings and revoke your consent.

How to get rid of your cookies:

The cookies are placed on your device. This means that we cannot delete them for you. You must do that yourself in the way prescribed by your specific device. If you are on a website operated by LEGO System A/S, you can also avoid cookies being placed by adjusting the browser settings on your device. If you are using an app published by LEGO System A/S, please note that cookies set in an app work in a different way and you will have to control this via your device directly. Real browser cookies are set to expire. Similar types of technologies, like local storage on your device, do not have expiration built-in but must be deleted by you.

81)    Due to Plaintiff's disability, he could not understand Defendant's website and he could not give informed consent to Defendant's installation of data and information tracking software on his computer. Defendant also could not give informed consent to Defendant's collection of his browsing history and the placement of analytics on his computer.

82)     Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from his computer and determine which programs should be installed and operated on his computer.

WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090
Facsimile: 1-305.809.8474
Email:info@mendezlawoffices.com
By: _____ /s/_____
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL  33014
Telephone:  786-290-1963
Facsimile:  305-824-3868
Email: radamslaw7@gmail.com
By: _____ /s/_____
RICHARD J. ADAMS, ESQ.
FL BAR NO.: 770434